# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1129-24

IN THE MATTER OF
REGISTRANT G.D.S.[1]

_____

Argued March 10, 2026 – Decided May 1, 2026

Before Judges Gooden Brown and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. ML-1190.

Kaitlin M. Kent argued the cause for appellant G.D.S. (Maynard Law Office, LLC, attorneys; Kaitlin M. Kent and James H. Maynard, on the briefs).

David M. Liston, Assistant Prosecutor, argued the cause for respondent State of New Jersey (Linda Estremera, Middlesex County Prosecutor, attorney; David M. Liston, of counsel; Brian D. Gillet, Legal Assistant, of counsel and on the brief).

PER CURIAM

---

[1] We use initials to preserve the confidentiality of records related to child victims of sexual assault or abuse. R. 1:38-3(c)(9), (12).

Registrant G.D.S. appeals from a November 12, 2024 Law Division order re-classifying him as a Tier II sex offender pursuant to the registration and community notification provisions of Megan's Law, N.J.S.A. 2C:7-1 to -23. G.D.S. argues the trial court erred in finding his 2017 harassment conviction constituted a sexually-related offense and factoring that offense into his Registrant Risk Assessment Scale (RRAS) calculation.[2] He further contends the trial court failed to adequately address evidence of his positive response to treatment and residential support, or his request for an "outside-the-heartland" exception to his classification. See In re Registrant M.L., 479 N.J. Super. 433, 444 (App. Div. 2024) (quoting In re Registrant G.B., 147 N.J. 62, 85 (1996)) (recognizing that in challenging a proposed RRAS score "a registrant may maintain that his case falls outside the 'heartland' of cases and, therefore, that he deserves to be placed in a tier other than that called for by the prosecutor's Scale score"). We have reviewed the record in light of applicable law, and affirm.

---

[2] The RRAS considers the following factors: one, degree of force; two, degree of contact; three, victim's age; four, selection of victim; five, quantity of offenses and victims; six, "duration of offensive behavior"; seven, "length of time since last offenses"; eight, "history of anti-social acts"; nine, "response to treatment"; ten, substance abuse; eleven, therapeutic support; twelve, residential support; and thirteen, stability of employment and education. Attorney General Guidelines for Law Enforcement for the Implementation of Sex Offender Registration and Community Notification Laws Registrant Risk Assessment Scale Manual, at 5-8 (Jun. 1998, rev. Feb. 2007) [hereinafter RRAS Manual].

I.

A.

Registrant's 2000 conviction of third-degree luring, N.J.S.A. 2C:13-6, required him to comply with Megan's Law and its reporting requirements. N.J.S.A. 2C:7-2(b)(2). Registrant pled guilty to that offense, admitting that, in 1998, he followed a twelve-year-old boy, M.M., and offered the child money to show registrant his penis.[3] He was sentenced to three years' imprisonment and Community Supervision for Life (CSL). The sentence was ordered to run concurrent to a not-yet imposed federal sentence upon registrant's conviction of several offenses related to his fondling detainees at an airport in 1997 in his capacity as an agent of the Immigration and Naturalization Service (INS).[4]

---

[3] Registrant provides on appeal the police report from this incident reflecting registrant approached M.M. and "asked [M.M.] 'How big is your penis[?]'" After M.M. left on his bike, registrant followed him and "again approached [M.M.] and said to him 'How would you like $10 for every inch of your penis you show me[?]'"

[4] The record reflects registrant, then an INS employee, was charged with fondling and robbing several detained men at an airport. A jury convicted registrant of two counts of "deprivation of the right to be free from sexual abuse," 18 U.S.C. § 242; one count of "deprivation of [the] right to property," 18 U.S.C. § 242; one count of "wrongful conversion of property of another while employed as an officer of the [INS]," 18 U.S.C. § 654; and registrant pled guilty to one count of "making false and fraudulent statements," 18 U.S.C. § 1001(a)(2).

The federal conviction was not considered as part of his initial 2003 Tier I classification.[5] Registrant was later convicted of fourth-degree violating the terms of CSL.

Years later, in 2017, registrant was charged with fourth-degree "harassment while imprisoned or on parole/probation," N.J.S.A. 2C:33-4(b), and third-degree endangering welfare of a child, N.J.S.A. 2C:24-4(a)(2). A jury convicted registrant of harassment, but found him not guilty of endangering.

The harassment and endangering charges arose from a November 16, 2016 encounter between registrant and M.D., a seventeen-year-old high school junior. At the trial, M.D. testified he was working at Dunkin' Donuts when registrant approached and engaged him in conversation and repeatedly asked M.D. to "smile," "gave [him] a creepy look and made [him] feel uncomfortable," "made a comment to him about watching . . . pornography and . . . '[g]etting off,'" twice followed him into the single-occupancy bathroom, grabbed his shirt, and

---

[5] Registrant's 2001 RRAS calculation summary reflected registrant scored a total of twenty points, placing registrant in the low-risk range. The points were derived from the following considerations: "victim was [twelve] at [the] time of offense"; "victim had never met reg[istrant] before [the] offense"; "[three prior] convictions including [the] instant offense"; and registrant was "[c]urrently unemployed." The summary noted registrant "[c]ompleted [a] sexual awareness program." A psychological evaluation of registrant from that year, described registrant as "an untreated sex offender with a potential to re-offend."

A-1129-24

told M.D. "aggressive[ly]" to "just go [to the bathroom] in front of [him]." M.D. fled the bathroom and called the police. M.D. feared registrant and felt he was "dangerous."

Registrant denied M.D.'s report of the encounter and claimed he was in the bathroom for his own personal use and merely told M.D. to get out. The investigating officer testified the video footage from Dunkin' Donuts, although not capturing inside the bathroom, "mirrored" M.D.'s description of events. Likewise, the 9-1-1 call to police was consistent with M.D.'s account of events.

Registrant was sentenced to three years' probation conditioned upon serving 180 days in county jail. The sentencing court found applicable aggravating factors three, N.J.S.A. 2C:44-1(a)(3), risk of re-offense; six, N.J.S.A. 2C:44-1(a)(6), extent and seriousness of prior convictions; and nine, N.J.S.A. 2C:44-1(a)(9), deterrence, as well as mitigating factor two, N.J.S.A. 2C:44-1(b)(2), no contemplation of the harm caused by his conduct.

A July 2017 psychological assessment and report prepared by Philip Witt, Ph.D., found registrant posed an "[a]verage [r]isk" of recidivism, recognizing registrant's victims were unrelated, male strangers. Regarding the management and stability of registrant's life, Dr. Witt concluded registrant was low risk. Dr. Witt characterized registrant as "somewhat confrontational."

A-1129-24

In October 2017, registrant was again convicted of violating the terms of his CSL without good cause, N.J.S.A. 2C:43-6.4(d), stemming from the 2017 harassment conviction. He was sentenced to two years' probation. The sentencing court found aggravating factors three, six, and nine applied.

A 2019 treatment summary from registrant's sex offender treatment provider, Marielena Motta, M.S., L.C.A.D.C., L.P.C., A.C.S., reported registrant "attend[ed] his sessions consistently," "[wa]s on time for each session and actively participate[d]," "t[ook] responsibility for his offense," "use[d] effective risk management strategies on a consistent basis," and "continue[d] to engage in adequate problem solving" with "a stable living environment" and "small circle of people in his life whom he identifie[d] as supportive."

Registrant's psychotherapist, Judith E. Rosenstein, M.S.W., L.C.S.W., authored two reports, in 2019 and 2024. Both detailed registrant's involvement in "specific sex offender therapy" since at least 2003 and noted he learned skills, including "relapse prevention." In 2019, Rosenstein opined registrant's new harassment conviction "was not a sex charge." (Emphasis in original). She further explained registrant's "personality and . . . mouth get him into difficulties," which "ha[s] nothing to do with any sex offense." In 2024, Rosenstein reported registrant "had not had any sexual charges since his initial

A-1129-24

offense over [twenty] years ago," "[h]e works long hours," "has a group of friends with whom he socializes," "has learned to calm down when he feels he has been wronged," "is aware of his environment and who is in it," and "does not put himself in risky situations." She did not consider elevated tiering appropriate.

B.

In November 2023, the State moved to amend registrant's tiering classification to Tier II. The State presented its updated RRAS score of sixty-five, which the State subsequently amended to a total of sixty, accounting for the passage of time and "no history of substance abuse," impacting factors seven and ten respectively.

The RRAS calculation summary reflected registrant scored as "low risk" for factors one, two, eleven, and thirteen. He scored as "moderate risk" for factors seven and ten. Registrant scored as "high risk" for factors three, as a prior victim under the age of thirteen; four, as the victim was a stranger to registrant; five, as registrant has more than three offenses; six, because registrant spanned more than two years of offensive behavior; eight, due to registrant's extensive prior anti-social acts; nine, based upon "prior unsuccessful treatment"

and "no progress in current treatment"; and twelve, due to a "problematic location and/or unstable/isolated" residence.

The State further supported its proposed scoring, citing: for factor six, registrant had "1997 Federal charges, 1998 State charges, and 2016 [South] Brunswick charges" which spanned "more than [five] years"; for factor nine, registrant was "[i]n treatment . . . for [twenty-two] years" but "reoffended in 2016 while in treatment" demonstrating "unsuccessful treatment"; and for factor twelve, registrant "[l]ive[d] alone in [a] multi-family house in North Brunswick . . . 1.2 miles from New Brunswick Middle School and [0].6 miles from Linwood (North Brunswick) Middle School."

On November 12, 2024, the court heard oral arguments on the State's petition. Highlighting registrant's three additional convictions after his initial offense, the State argued the increase was required. The State characterized the harassment conviction as sexual in nature, relying on M.D.'s trial testimony describing the details of registrant's conduct. The State thus argued the "duration" of registrant's offenses spanned "1996 to November 16[], 2016[,] which is the incident . . . at the Dunkin['] Donuts."

The State characterized registrant having a "predilection for boys" and, despite his Megan's Law status, committed the 2016 offense again involving a

young victim. The State cast registrant's dispute over whether the harassment was a sex offense as "a mirage," as the court could find by clear and convincing evidence the harassing conduct had "sexual overtones."

Regarding the "duration" of offending behavior, the State asserted the range spanned 1997 to 2016 signaling a "high risk," as registrant had been in sex offender treatment for over twenty years, which had not been effective. Additionally, the State contended there was no justification for an "outside-the-heartland exception" as registrant remained a clear danger to others, noting his victims were strangers to him. The State argued the increase was necessary to protect the public and contended the RRAS score of sixty and increased tiering and internet restrictions were appropriate.

Registrant challenged the RRAS findings regarding factors six, nine, and twelve and proposed a RRAS score of forty-five. Registrant also sought "an [o]utside[-]the[-h]eartland tier reduction to continue to have [registrant] treated as Tier I." Registrant argued his 2017 harassment conviction was not a sex offense, as he was found not guilty of endangering, and it was possible the jury found him guilty of purely "non-sexual harassment." Registrant further contended M.D.'s account lacked credibility. He countered M.D.'s claims and explained he merely needed to use the bathroom and asked M.D. to leave. He

9

claimed he asked M.D. to "smile" because M.D. seemed "perturbed" and "not customer friendly." Registrant asserted his version of events was consistent with the two evaluations conducted after the incident, which explained registrant's "assertive" and "loud behavior" was often perceived as "aggressive."

Challenging the RRAS factors, registrant argued his last sex offense was in 1998, and he never committed another sex offense while in successful treatment. He also asserted that he lived "more than half a mile" away from a school and did not pose an increased risk based on location. He contended his second CSL violation did not involve failing to report to parole and was "a direct result of the conviction for the harassment."

The court granted the State's application elevating registrant's classification to Tier II. Although acknowledging registrant's and M.D.'s stories diverged regarding the 2016 harassment, the court determined the circumstances of the harassment as recounted by M.D. were "sexual in nature" and constituted a sexually-based offense. Accordingly, the court concluded the offending conduct extended at least to 2017. It found the State "clearly . . . met [its] burden by clear and convincing evidence . . . so the time does get extended from the 1997 to the 2017 [harassment conviction or] to 2019 [violation of CSL] if they want to use it to that extent." The court was persuaded the jury "found

10

[registrant] guilty [of] a sexually-based harassment," as the facts supported that conclusion.

The court emphasized "the nature of [registrant's] history involving stranger victims, involving men and in these past two instances involving two juveniles, . . . one much younger than the other." The court found registrant "has seemingly up to 2017 . . . a history of predator type behavior which most certainly requires that the community be protected under the Megan's Law scheme and notification tiering that the State is suggesting." It also observed registrant "was in treatment and reoffended, not only with a crime but a sexually based crime." Noting M.D. was seventeen at the time of the offense, the court found "this crime [wa]s similar to the other crimes that [registrant] . . . engaged in [which] made him initially subject to Megan's Law."

The order memorialized the court's decision, designating "registrant is Tier II, moderate level risk of re-offense," with a RRAS score of sixty. The order stated the need for the amendment was proven "by clear and convincing evidence and is based upon a full review of each factor" and upon consideration of all documents provided and referenced by either party, with "due consideration of any evidence proffered by . . . registrant." The order imposed

A-1129-24

a half-mile radius for notification of "schools, day care centers and other community organizations."

## II.

On appeal, registrant argues:

POINT I

AS A MATTER OF LAW THE MEGAN'S LAW COURT ERRED WHEN THE COURT ENGAGED IN SPECULATION REGARDING FACTS THAT A JURY MAY HAVE FOUND IN SUPPORT OF THE VERDICT RENDERED

A.  Summary of Argument Regarding the Court's Speculation Regarding the Jury's Split Verdict

B.  Judges May Not Engage in Speculation Regarding the Facts Upon Which a Jury Verdict Rests

C.  Jurors Need Only Agree that Every Element of the Crime Charged Has Been Proven, Not the Particular Facts Supporting Those Elements

D.  The Trial Court Erred By Attempting to Act as a Thirteenth Juror in G.D.S.'s 2017 Trial

POINT II

THE MEGAN'S LAW COURT ERRED, AS A MATTER OF LAW, IN CONCLUDING THAT A CONVICTION FOR HARASSMENT CONSTITUTES A SEX OFFENSE UNDER MEGAN'S LAW

12

POINT III

THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO PROVIDE ANY EXPLANATION, LET ALONE A "RATIONAL EXPLANATION," FOR ITS SCORING OF RRAS ITEMS [NINE] AND [TWELVE], AND ITS DENIAL OF THE OUTSIDE-THE-HEARTLAND MOTION

"We review a trial court's conclusions regarding a Megan's Law registrant's tier designation and scope of community notification for an abuse of discretion." In re Registrant B.B., 472 N.J. Super. 612, 619 (App. Div. 2022). "[A]n abuse of discretion 'arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" State v. R.Y., 242 N.J. 48, 65 (2020) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)) (excess internal quotation marks omitted). "A trial court's interpretation of the law and the . . . consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Megan's Law registration and notification procedures aim "to protect the community from the dangers of recidivism by sexual offenders." In re Registrant, C.A., 146 N.J. 71, 80 (1996) (citing N.J.S.A. 2C:7-1(a)). N.J.S.A. 2C:7-8(c) outlines three tiers of notification:

13

(1)  If risk of re-offense is low, law enforcement agencies likely to encounter the person registered shall be notified;

(2)  If risk of re-offense is moderate, organizations in the community including schools, religious and youth organizations shall be notified in accordance with the Attorney General's guidelines, in addition to the notice required by paragraph (1) of this subsection;

(3)  If risk of re-offense is high, the public shall be notified through means in accordance with the Attorney General's guidelines designed to reach members of the public likely to encounter the person registered, in addition to the notice required by . . . (1) and (2) of this subsection.

RRAS scores between zero and thirty-six are categorized as "[l]ow"; between thirty-seven and seventy-three are "[m]oderate"; and above seventy-four are "[h]igh."  See RRAS Manual, at 4.

Megan's Law tier designations are judicial determinations "reflect[ing] a registrant's risk of re-offense" based on the thirteen RRAS factors as well as other information.  In the Matter of C.J., 474 N.J. Super. 97, 106 (App. Div. 2022).  "[B]y way of a tiering hearing, . . . the State must demonstrate by clear and convincing evidence both the registrant's level of risk to the community and the scope of notification necessary to protect the community."  M.L., 479 N.J. Super. at 443 (citing In re Registrant R.F., 317 N.J. Super. 379, 383-84 (App. Div. 1998)).  "Judicial determinations regarding tier classification and

14

community notification are made 'on a case-by-case basis within the discretion of the court[]' and 'based on all of the evidence available.'" C.J., 474 N.J. Super. at 120 (alteration in original) (quoting G.B., 147 N.J. at 78-79).

"[T]he RRAS, the validity of which has been upheld by [our] court[s], . . . may be used by the State 'to establish its prima facie case concerning a registrant's tier classification and manner of notification.'" In re Registrant T.T., 188 N.J. 321, 328 (2006) (quoting C.A., 146 N.J. at 110). Although the RRAS "should not be viewed as absolute," "[i]n most cases, . . . the tier classification suggested by the [RRAS] will be the same classification . . . approved by the court," unless a registrant "presents subjective criteria that would support a court not relying on the tier classification recommended." C.A., 146 N.J. at 109; see also In re Registrant J.G., 463 N.J. Super. 263, 276 (App. Div. 2020) (emphasizing the RRAS are "presumptively reliable"). A court will typically "affirm the prosecutor's determination unless it is persuaded by a preponderance of the evidence that it does not conform to the law, . . . [t]he court's determination is independent and based on its own review of the case." C.A., 146 N.J. at 84.

Registrant first argues the court erred by engaging in improper speculation that a jury found registrant's 2017 harassment conviction was a sexually related

offense. He contends the court therefore erroneously calculated the RRAS score, particularly as to factor six, impermissibly extending the duration of the offending behavior. We are not persuaded.

We recognize N.J.S.A. 2C:7-2(b) lists offenses deemed "sex offense[s]" relevant to Megan's Law; and harassment is not one of the enumerated offenses. However, in In re Registrant J.M., 167 N.J. 490, 504 (2001), the Court clarified "a registrant's past sexual offense history, not just registrable sexual offenses," can be considered "when judging the registrant's risk of re-offense." Thus, a "registrant's past offenses that include a sexual component are relevant in assessing the registrant's risk of re-offense." Id. at 506. This includes "all offenses of a sexual nature." Id. at 503. Even dismissed counts or "non[-]conviction offenses" may be included in the assessment if "relevant to the risk of re-offense." C.A., 146 N.J. at 92-93.

Here, the trial court reviewed the record and determined registrant's 2017 conviction for harassment was "sexual in nature," relying heavily on M.D.'s testimony. The court found only one set of facts undergirded the conviction—registrant's taunting an underage M.D., in part with sexual comments, and following M.D. twice into a single-occupancy bathroom. The court found M.D.'s testimony credible as to what occurred inside the bathroom and his fear

16

of registrant. The court outlined the basis for its decision, and determined the State established by clear and convincing evidence "the circumstances that le[d] to the conviction for . . . harassment in this particular case, ma[d]e it a sexually based offense," because "the misconduct engaged in by [registrant] per the testimony of the victim was sexual in nature." The court made its findings "by clear and convincing evidence."

We are satisfied the trial court did not abuse its discretion. It applied the proper standard of proof and rooted its determination in credible evidence in the record. To conclude otherwise based on the jury's verdict, made subject to a wholly different legal standard of proof, would amount to the very speculation regarding the jury's findings registrant opposes. A criminal conviction need not result to confirm an offense is sexual for tiering consideration. As such, we discern no basis to disturb the court's determination that the harassment conviction was a sexually-related offense and appropriate for incorporation into the RRAS scoring.

Accordingly, we conclude the court did not err in extending the duration of the offending conduct to at least 2016, the time of the incident, under factor six. The court found the "history of predator type behavior" continued to the 2016 incident with M.D., and warranted further protection of the public. The

court further noted the second violation of CSL in 2019 warranted extension of the offense range. Thus, we are convinced the court properly evaluated factor six.

Registrant next argues the court failed to adequately address evidence of his treatment efforts and his specific challenge to the RRAS score as to factor nine, "response to treatment," or to sufficiently consider evidence of his support system and his specific challenge to his RRAS score as to factor twelve, "residential support." He faults the court's decision for failure to sufficiently state its reasons. These arguments are belied by the record.

Regarding RRAS factor nine, a registrant's "response to treatment," guidance from the Attorney General recognizes a registrant's re-offense while in treatment is a significant, relevant consideration. See RRAS Manual, at 7. Here, the court specifically acknowledged registrant's 2016 offense was sexually-related and occurred while he was in treatment. The court found this relevant, and also referenced registrant's CSL violations while in treatment. Importantly, the court specifically noted the similarities between the new offense and registrant's prior conduct, emphasizing the victim was a minor and unknown to registrant before the encounter, as in the past. The court's reasoning clearly reflected its concern regarding registrant's continued "predatory" conduct while

in treatment, a concern based in the record. Thus, we reject registrant's argument the court's findings we unsupported regarding RRAS factor nine.

We similarly reject registrant's challenges to the sufficiency of the court's findings as to factor twelve. Considerations regarding "residential support" include a registrant's distance from schools, support from friends and family, and regularity of registrant's reporting to probation as relevant considerations. See ibid. We recognize the court did not itemize each RRAS factor and apply its reasoning or findings to each or do so specifically as to factor twelve. However, the court noted registrant's CSL violations reflected upon registrant's compliance with probation. It also made pervading findings the 2016 harassment reflected on the insufficiency of registrant's current status and circumstances.

Registrant specifically challenges the level of risk attributed to his residential proximity to schools, but he does not appear to dispute that he lives alone, 0.6 miles from one middle school, and 1.2 miles from another middle school. Although this information was not specifically identified by the court in its oral decision or written order, these facts were part of the record before the court and the court stated it "full[y] review[ed]" the entire record and "each factor of the RRAS."

A-1129-24

Registrant also claims the court did not "acknowledge, or incorporate into its review and analysis, the psychosexual evaluation by Dr. . . . Witt." However, this argument fails by simple review of the court's written order expressly indicating it reviewed "all documents" including "psychiatric or psychological evaluations" in reaching its decision. Specifically, the court assured:

> Such finding is by clear and convincing evidence and is based upon a full review of each factor of the RRAS, all documents previously provided to the court and to the registrant by the State and incorporated by reference herein including but not limited to the RRAS, court documents, offense reports, and psychiatric or psychological evaluations, as well as due consideration of any evidence proffered by the registrant.

Notably, Dr. Witt assessed registrant as having an "average risk" of recidivism, which finding on its face fails to suggest registrant was somehow "substantially less likely to reoffend than the general sex offender." See ibid. (quoting G.B., 147 N.J. at 83). Thus, we are satisfied the trial court sufficiently considered and rejected all registrant's arguments in reaching its decision.

We further note registrant argued before the trial court his RRAS score should be forty-five, which nonetheless falls within the range for Tier II classification. See RRAS Manual, at 4 (scores between thirty-seven and seventy-three are "[m]oderate" or Tier II). Thus, had the trial court been persuaded by each of registrant's challenges to specific RRAS factors and

20

accepted registrant's proposed RRAS score, such a score still would have justified an increase in registrant's classification to Tier II. See R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result.").

Finally, we address and reject registrant's argument the court failed to properly address his request for a tiering "heartland" exception, classifying him below the RRAS recommended level. Although we recognize the court did not specifically delineate its ruling on registrant's request, we are satisfied from the court's decision in its entirety that it adequately considered and rejected the application.

"Only in the unusual case where relevant, material, and reliable facts exist for which the [RRAS] does not account, or does not adequately account, should the [RRAS] score be questioned." M.L., 479 N.J. Super. at 444 (quoting G.B., 147 N.J. at 82). Such a rare departure from the RRAS recommendation is only justified when the facts of the case are "sufficiently unusual to establish that a particular registrant's case falls outside the 'heartland' of cases." Ibid. (quoting G.B., 147 N.J. at 82).

Registrant's arguments before the trial court in support of an "outside-the-heartland" reduction centered upon his claims that he "remained sex offense-

free for over twenty years," and, alternatively, that there had been no allegations of "sexually inappropriate behavior" since his 2017 harassment conviction and had since successfully completed treatment. That the trial court was not persuaded is evident in its express findings, which we have already determined were grounded in the record.

The court found registrant reoffended sexually when he harassed M.D. and emphasized registrant was "in treatment" at the time he reoffended. The court also acknowledged registrant's history of preying upon young victims who "were total strangers to him." The court specifically found heightened notification tiering was necessary based on registrant's "predator type behavior . . . which most certainly requires that the community be protected under the Megan's Law scheme . . . ." In the wake of these findings, we perceive no reasonable possibility the court failed to fairly consider registrant's claim these circumstances somehow mitigated in favor of a reduced tiering below the corresponding scoring range.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1129-24