**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1387-16T1

IN THE MATTER OF
REGISTRANT N.F.,

    Appellant.

_____

        Argued April 24, 2018 — Decided June 11, 2018

        Before Judges Yannotti, Mawla and DeAlmeida.

        On appeal from Superior Court of New Jersey,
        Law Division, Hudson County, Docket No.
        16090004.

        Michael C. Woyce argued the cause for
        appellant N.F. (Murphy & Woyce, attorneys;
        Michael C. Woyce, on the brief).

        Kristen L. Brewer, Assistant Prosecutor,
        argued the cause for respondent State of New
        Jersey (Esther Suarez, Hudson County
        Prosecutor, attorney; Kristen L. Brewer, on
        the brief).

PER CURIAM

    N.F. appeals from an order entered by the Law Division on

November 30, 2016, which designated him as a Tier II sex offender

under the Registration and Community Notification Laws, N.J.S.A.

2C:7-1 to -11 (Megan's Law), and as subject to Tier II community

notification and inclusion on the Sex Offender Internet Registry (Internet Registry), N.J.S.A. 2C:7-12 to -19. We affirm.

I.

This appeal arises from the following facts. On or about November 28, 2011, the North Bergen Police Department (NBPD) received an anonymous phone call alleging possible child abuse. NBPD detectives located the witness, J.D., who reported that a man (later identified as N.F.) had shown her a video depicting a man engaging in sexual activity with a young female child named "Jackie."

According to J.D., N.F. claimed he was the man in the video. The NBPD referred the matter to the Special Victims Unit (SVU) in the Hudson County Prosecutor's Office (HCPO). J.D. also met with investigators from the New Jersey Division of Youth and Family Services (the Division) and described what she had seen.[1]

SVU Detective Kristen Fusiak interviewed J.D., who provided a statement under oath. J.D. explained that on November 26, 2011, she was driving around with a female friend. They picked up N.F., whom she had never met before. They then drove to N.F.'s home, but only J.D. and N.F. went inside. While sitting in the living room, J.D. and N.F. discussed their childhoods and previous incidents

---

[1] The Division is now known as the Division of Child Protection and Permanency.

of sexual assault. N.F. then began discussing a girl named "Jackie." He retrieved a laptop computer and showed J.D. approximately five minutes of a video depicting a man receiving oral sex from a young female who appeared to be between the age of seven and ten years old.

According to J.D., N.F. claimed to be the man in the video, although his face was not shown. He also identified the minor as "Jackie," a ten-year-old "neighbor" he sees regularly. N.F. said he engaged in oral and anal sex with the minor. J.D. stated that N.F. also showed her other child pornographic videos in which he was not involved, and asked J.D. if she would like to engage in sexual relations with him and the minor. J.D. left N.F.'s home.

On November 30, 2011, Fusiak showed J.D. approximately sixteen photographs of fourth, fifth, and sixth grade classes at a North Bergen elementary school. J.D. did not identify any of the females as the minor in N.F.'s pornographic video. On December 2, 2011, J.D. was shown a photograph of J.B. She stated she was eighty-percent sure that it was the photograph of the female child shown in the pornographic video that N.F. had shown to her.

On December 2, 2011, members of the SVU and NBPD executed multiple search warrants at N.F.'s addresses in North Bergen and another municipality, and communications-data warrants for any items seized at those locations. The searches yielded, among other

things, several computers, a digital camera, and one unmarked video tape. Numerous videos and images of child pornography were found on the electronic devices. The video that J.D. had described was not located.

However, among the videos recovered was a homemade pornographic video depicting N.F. and a female he refers to as his "cousin." On the video, N.F. discussed sodomizing a young girl with a broomstick, and then stated "let's see like I'd wanna [sic] do that to like, like a girl that's a little under developed like someone like [A.], like [ten] years old going on [eleven]." N.F. and his "cousin" then discussed engaging in sexual activity with a juvenile.

One of the Division's workers spoke with N.F.'s children, and one of the children advised her that he has an eight-year-old playmate named "Jackie" who lives nearby. J.B., who goes by the name of "Jackie," and her mother, Ja.B., were brought to the HCPO to give a statement. Ja.B. stated that N.F. was a friend of her ex-husband.

Ja.B. said J.B. spent a lot of time at N.F.'s home playing with his children and slept over at N.F.'s house approximately three times. N.F. was there two of those times. Ja.B. stated that on one occasion J.B. returned from N.F.'s home and was "acting weird" in the bathroom. J.B. told Ja.B. that she was bleeding from

her vaginal area and had a pinkish discharge. However, J.B. denied that anyone touched her.

Fusiak spoke with J.B. and had her identify certain body parts on anatomically-detailed drawings. Fusiak asked J.B. if there was any place on her body that no one was permitted to touch. J.B. responded that no one was supposed to touch her "private part" and "butt." J.B. initially hesitated in answering, but then said no one was allowed to touch her chest. When asked why she hesitated, J.B. responded that she had to think if anyone had touched her. She denied ever seeing male genitals. She acknowledged she spends time at N.F.'s home and has slept over there.

Fusiak and J.B. next discussed the incident in the bathroom. J.B. initially claimed she did not remember the incident but then said "it was kind of at two places" — once at her house and once at another house where she lived at times. She stated that at her house, her private part hurt and she did not know why. She also said nothing came out, and she did not know what Ja.B. saw when she examined her. J.B. stated she told her mother that no one had touched her. J.B. said, however, that blood came out of her private part at the other house.

When asked about N.F., J.B. said she did not like him because he is "weird." J.B. stated that she did not think N.F. was cute and she denied having a crush on him. When asked if N.B. had a

crush on her, J.B. said she was not sure. J.B. answered "no" to nearly every question about sexual matters that Fusiak asked. However, when asked if N.F. touched her butt, J.B. initially said yes and then quickly said no. J.B. also denied N.F. had ever recorded her on video. Eventually, J.B. began crying and said she did not want to continue the discussion.

Shortly thereafter, J.B. returned to the interview room, and Fusiak questioned her about a Facebook conversation J.B. had with N.F. The messages read as follows:

> J.B.: I waz up im so bored
>
> N.F.: It's late baby girl. Get ready for bed.
> Love you.
>
> J.B.: reallyyyyyyyyyy
>
> N.F.: Really really (with a smiley face)
>
> J.B.: yesss
>
> J.B.: Jookie!!!!
>
> J.B.: wat[sic]!!!!!!!!!

Fusiak explained to J.B. that the conversation could be interpreted as a boyfriend-girlfriend relationship. J.B. said she did not like N.F. and continued to deny that anyone ever touched her body parts, specifically N.F. Fusiak told J.B. she saw the video of her and N.F., but J.B. denied ever touching male genitals. J.B. acknowledged the videotaping by stating that the incidents

A-1387-16T1

happened in the living room and sometimes the other children were in another room.

She said N.F. touched her belly and demonstrated a chopping motion. When asked what sexual touching happened in the living room, J.B. denied that any such touching occurred and said she did not remember anything. Several days later, Ja.B. called Fusiak to inform her that J.B. claimed N.F. had promised her an iPod.

On December 7, 2011, N.F.'s ex-wife, T.F., was interviewed. N.F. and T.F. have three children together. Among other things, T.F. said four neighborhood children frequented their home to play with her children, and one of the children was named "Jackie." T.F. told Fusiak that either she, N.F., or a babysitter would be home when the children would play together.

T.F. denied that any other neighborhood children frequented her home. T.F. also said there was a laptop computer in the home that recently broke when her son spilled juice on it. The last time she saw the laptop was November 30, 2011. T.F.'s children were also interviewed. They acknowledged there was another laptop in the home, but stated they had not seen it recently.

N.F. was charged with first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a) (count one); second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (count two); fourth-degree abuse, cruelty and neglect of a child, N.J.S.A. 9:6-1 and -3 (count

three); first-degree endangering the welfare of a child (creation of child pornography), N.J.S.A. 2C:24-4(b)(3) (count four); second-degree endangering the welfare of a child (distribution of child pornography), N.J.S.A. 2C:24-4(b)(5)(i) (count five); and fourth-degree endangering the welfare of a child (possession of child pornography), N.J.S.A. 2C:24-4(b)(5)(ii) (count six).

On October 1, 2013, N.F. pled guilty to count five. On January 24, 2014, he was sentenced to five years in state prison, and required to register as a sex offender under Megan's Law, N.J.S.A. 2C:7-2. After his release from custody, N.F. registered as required. The HCPO filed a notice of proposed Tier II classification, Tier II notification to the community, and inclusion on the Internet Registry. N.F. filed an objection to the proposed classification and requested an evidentiary hearing.

On November 18, 2016, the Law Division judge conducted a hearing in the matter. N.F. presented the testimony of Dr. James R. Reynolds, a psychologist and expert in the field of sex offender treatment and risk assessment. Dr. Reynolds opined that N.F. was a low risk for involvement in future criminal behavior. Dr. Reynolds scored N.F. as having an overall total of five points on the Registrant Risk Assessment Scale (RRAS). He gave N.F. three points for history of anti-social acts and two points for substance abuse that is in remission. Dr. Reynolds gave N.F. zero points for

all other factors on the RRAS. In his report, Dr. Reynolds opined that the available records indicated that allegations N.F. sexually abused an underage child were not substantiated.

On November 30, 2016, the judge heard oral argument and rendered a decision from the bench, finding N.F. subject to Tier II classification, Tier II community notification, and inclusion on the Internet Registry. The judge memorialized his findings in an order dated November 30, 2016, and granted an oral motion for stay of placement on the Internet Registry pending appeal. This appeal followed.

On appeal, N.F. raises the following arguments: (1) the trial court incorrectly applied the RRAS in evaluating his risk by applying inappropriate factors regarding his offense; (2) notwithstanding his RRAS score, he should be subject to Tier I community notification without placement on the Internet Registry; (3) the State did not prove by clear and convincing evidence that he committed an act of sexual penetration with a minor female; and (4) the RRAS is being applied differently in certain counties, with the potential for arbitrary results.

II.

We begin our consideration of the appeal by summarizing the relevant provisions of Megan's Law and the tier classification process. Depending on the type and time of offense, Megan's Law

9

requires certain sex offenders to register with local law enforcement agencies and notify the community. In re T.T., 188 N.J. 321, 327 (2006) (citing N.J.S.A. 2C:7-2). Because registration and community notification under Megan's Law has a significant impact upon a registrant's personal liberties, the trial court must balance the registrant's right to privacy against the community's interest in safety and notification. In re Registrant G.B., 147 N.J. 62, 74 (1996). In applying this balancing test, the RRAS is a reliable tool. Id. at 81—82.

The RRAS is an instrument used to determine whether a sex offender's risk of re-offense is low (Tier I), moderate (Tier II), or high (Tier III). State v. C.W., 449 N.J. Super. 231, 260 (2017) (citing In re V.L., 441 N.J. Super. 425, 429 (App. Div. 2015)). In assigning a tier rating to a registered sex offender, the court considers thirteen factors across four categories: (a) seriousness of the offense; (b) the offender's history; (c) community support available; and (d) the characteristics of the offender. Ibid. (citing V.L., 441 N.J. Super. at 429).

"Seriousness of offense" includes: (1) degree of force; (2) degree of contact; and (3) age of victim. In re Registrant C.A., 146 N.J. 71, 103 (1996). "Offender's history" includes: (4) victim selection; (5) number of offenses/victims; (6) duration of

offensive behavior; (7) length of time since last offense; and (8) any history of anti-social acts. Ibid.

"Support available" and "characteristics of offender" are considered "dynamic categories, because they are evidenced by current conditions." Ibid. "Characteristics of offender" includes: (9) response to treatment and (10) substance abuse. Id. at 103—04. "Support available" includes: (11) therapeutic support, (12) residential support; and (13) employment/educational stability. Id. at 104.

Each factor is assigned a risk level of low (0), moderate (1), or high (3), and "[t]he total for all levels within a category provides a score that is then weighted based on the particular category." Ibid. A registrant who receives a total factor score below thirty-seven is considered Tier I and a low risk for re-offense. Id. at 83. A registrant who receives a total factor score of more than thirty-seven, but less than seventy-four, is deemed Tier II and a moderate risk for re-offense. Ibid. Finally, a registrant who receives a total factor score of seventy-four or higher is considered Tier III and a high risk for re-offense. Ibid.

N.J.S.A. 2C:7-8(c)(1) provides that when risk of re-offense is low, "law enforcement agencies likely to encounter the [registrant]" must be notified. When risk of re-offense is

11

moderate, "organizations in the community including schools, religious and youth organizations" must be notified in addition to the notice to law enforcement agencies. N.J.S.A. 2C:7-8(c)(2). When risk of re-offense is high, public notice "designed to reach members of the public likely to encounter the [registrant]" is required, in addition to the other notice required. N.J.S.A. 2C:7-8(c)(3). Additionally, "where public access . . . [is] warranted, based on the relative risk posed by the particular offender," some offenders will be subject to the Internet Registry. N.J.S.A. 2C:7-13(b).

The RRAS is, however, "only one possible consideration" of many in determining a registrant's risk of re-offense. G.B., 147 N.J. at 78. Although the RRAS is a "useful tool to help prosecutors and courts determine whether a registrant's risk of re-offense is low, high, or moderate," it is "not a scientific device." C.A., 146 N.J. at 108.

"[I]t is impossible to create an all-inclusive scale," and thus, "any classification based on the [RRAS] should not be viewed as absolute." Id. at 109. Judicial determinations regarding tier classification and community notification should be made "on a case-by-case basis" within the discretion of the court and based on all of the evidence available, not simply by following the "numerical calculation provided by the [RRAS]." G.B., 147 N.J. at

12

78—79 (quoting C.A., 146 N.J. at 109). Ultimately, "a value judgment" is required. Id. at 78 (citing C.A., 146 N.J. at 109).

Moreover, all judicial determinations regarding tier classification and community notification "must be [made] by clear and convincing evidence." G.H. v. Twp. of Galloway, 401 N.J. Super. 392, 403 (App. Div. 2008) (citing E.B. v. Verniero, 119 F.3d 1077, 1111 (3d Cir. 1997)). Clear and convincing evidence has been characterized "as evidence on which the trier of fact can rest 'a firm belief or conviction as to the truth of the allegations sought to be established.'" In re Registrant J.G., 169 N.J. 304, 330—31 (2001) (quoting Matter of Purrazella, 134 N.J. 228, 240 (1993)).

In challenging a tier designation, a registrant may argue that: (1) the RRAS score was erroneously calculated; (2) the case falls outside the "heartland" of Megan's Law cases; and (3) the extent of community notification required is excessive due to "unique" aspects of the registrant's case. T.T., 188 N.J. at 330 (quoting G.B., 147 N.J. at 85). In presenting such a challenge, the registrant must introduce evidence showing the RRAS "did not accurately weigh certain factors" or "take into account certain peculiar factors" relevant in determining a registrant's risk of re-offense. G.B., 147 N.J. at 82.

13

N.F. argues that the State failed to establish by clear and convincing evidence that he engaged in sexual penetration with anyone other than consenting adults. N.F. therefore argues his score of fifteen (high risk) in factor two of the RRAS (degree of contact) was erroneous. We disagree.

When calculating a registrant's score on the RRAS, "the State is free to rely on hearsay statements to support its assertions and does not need to base its calculations surrounding the underlying offense solely on the facts of conviction." G.B., 147 N.J. at 79 (citing C.A., 146 N.J. at 88—93). The trial court then may consider "all reliable information" including "[s]exual offenses, not the subject of a conviction" and supported by admissions, police reports, and psychiatric reports. In re J.W., 410 N.J. Super. 125, 130—31 (App. Div. 2009) (citing In re Registrant C.A., 285 N.J. Super. 343, 347—48 (App. Div. 1995)). The trial court may rely on the evidence it considers relevant and trustworthy in making its determination. C.A., 285 N.J. Super. at 343.

On appeal, we must accord substantial deference to the trial court's factual determinations if supported by "adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co.,

65 N.J. 474, 484 (1974)). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). We must defer to the trial court's factual findings "regardless of whether the evidence is live testimony, a videotaped statement, or documentary evidence." State v. S.N., 231 N.J. 497, 514 (2018) (citing State v. S.S., 229 N.J. 360, 379 (2017)).

In this case, the trial judge found that the State had proven by clear and convincing, if not overwhelming, evidence that N.F. had committed an act of sexual penetration upon the female minor, J.B. The judge found that J.D.'s statements on this issue were "completely credible" and, for this reason, N.F. would receive a score of fifteen (high risk) on factor two of the RRAS (degree of contact). There is sufficient credible evidence in the record to support the judge's finding.

As the judge pointed out in his decision, J.D. stated under oath that N.F. showed her a video of a man receiving oral sex from a young female victim who appeared to be between the ages of seven and ten years old. Furthermore, N.F. identified himself as the man depicted in the pornographic video. N.F. also identified the young female victim as "Jackie," a ten-year-old "neighbor" whom he sees regularly.

As noted previously, when they executed the search warrants, the investigators could not locate the video that J.D. described. The judge found, however, that this did not mean the video did not exist on the night J.D. said she saw it. Moreover, N.F. told J.D. that he engaged in oral and anal sex with the young female victim, and he invited J.D. to engage in sexual relations with him and the victim. The judge found J.D.'s statement was "completely credible and reliable."

We note that J.D.'s statement was corroborated by other evidence, including the significant amount of child pornography recovered from N.F.'s home, his inappropriate Facebook conversation with a female minor nicknamed "Jackie" who lived nearby, and the numerous similarities between N.F.'s conversation with J.D. and his conversation with his "cousin" in a homemade pornographic video that was recovered later. In that video, N.F. is seen telling his "cousin" he wanted to sexually penetrate a named ten-year-old female.

Accordingly, we conclude there is sufficient credible evidence in the record to support the judge's finding that N.F. sexually penetrated a young female victim who was about ten years old. The record supports the judge's determination that N.F.'s score in factor two of the RRAS (degree of contact) was fifteen.

A-1387-16T1

Next, N.F. argues that the judge erroneously scored his RRAS, resulting in an inaccurate and inflated risk assessment. As stated previously, the judge placed N.F. in Tier II, the moderate level of risk of re-offense for Megan's Law community notification, based on a final score of sixty-three on the RRAS.

In the category of "seriousness of offense," the judge found that N.F. had a total score of thirty. This score consisted of fifteen points (high risk) for factor two (degree of contact) based on the aforementioned finding of penetration. It also included fifteen points (high risk) for factor three (age of the victim), since the victim was under the age of thirteen.

In the category of "offense history," the judge found N.F. also had a total score of thirty. This score consisted of nine points (high risk) for factor four (victim selection), nine points (high risk) for factor five (number of offenses/victims), three points (moderate risk) for factor seven (length of time since last offense), and nine points (high risk) for factor eight (history of anti-social acts).

In addition, in the category of "characteristics of offender," the judge found that N.F. had a score of two (moderate risk) for factor ten (substance abuse). The judge also found that

N.F. had a score of one (moderate risk) in factor thirteen (education/employment stability).

On appeal, N.F. argues that factors one through five of the RRAS should not be scored for child pornography offenders. He contends these factors are designed primarily for "contact offenses," and should be left un-scored in cases involving child pornography offenders.

We note, however, that N.F. did not receive a score for factor one (degree of force). Moreover, N.F.'s score for factor two (degree of contact) was based on the finding that he committed an act of sexual penetration upon the female victim, who was about ten years old. Factor three (age of the victim) was based in part on the age of the victim, who was under thirteen years of age, and the many other victims who appear in the child pornography videos. The scores on factors four (victim selection) and five (number of offenses/victims) also were based on the victims depicted in the numerous child pornography videos found in N.F.'s house.

Notwithstanding N.F.'s arguments to the contrary, we are not convinced that it was inappropriate for the court to consider his possession and distribution of child pornography for purposes of scoring factors three, four, and five. The courts have recognized that children depicted in child pornography are, in fact, victims.

A-1387-16T1

In <u>New York v. Ferber</u>, 458 U.S. 747, 759 n.10 (1982), the Court observed that

> Pornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him [or her] in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system of child pornography.

See also <u>In re Cohen</u>, 220 N.J. 7, 12 (2014) (noting that each time someone views child pornography, the child depicted therein is again victimized).

Here, N.F. was subject to registration and community notification under Megan's Law because he was found guilty of endangering the welfare of a child through the distribution of child pornography to J.D. <u>See</u> N.J.S.A. 2C:7-2(a)(2); N.J.S.A. 2C:24-4(b)(5)(a)(i). The fact that a registrant has possessed numerous child pornography videos is an appropriate consideration in determining whether there is a risk that the registrant will re-offend in this manner. Therefore, in scoring factors three, four, and five of the RRAS, it was appropriate for the court to consider the many victims depicted in the child pornography videos N.F. possessed.

In support of his argument that child pornography offenders should not be scored in factors one through five of the RRAS, N.F. relies upon In re Registrant P.B., 427 N.J. Super. 176 (App. Div. 2012). In that case, the registrant was charged with third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(b)(5)(a) and (b), for possession of child pornography on his home computer, and he pled guilty to third-degree child endangerment under N.J.S.A. 2C:24-4(a). Id. at 180. On the RRAS, the registrant received a total score of seventy-two, placing him in the category of persons who pose a moderate risk to re-offend. Ibid. On appeal, the registrant argued this tiering was incorrect. Id. at 179.

We "reject[ed] the notion" that a "high" risk level under factor two (degree of contact) could be "satisfied by a showing that a registrant merely possessed depictions of penetrative sexual activity with children, without any concomitant indication that [the registrant] played a role in the penetrative activity either as a participant or a producer." Id. at 183. We explained

> it seems evident from N.J.S.A. 2C:7-1 to -23 and authoritative interpretive materials developed to implement the legislation that, under the very terms of Megan's Law alone, the accused must have engaged in some kind of participation in penetrative activity before he or she can be deemed to be responsible for it on any level.
>
> Ibid.

N.F. argues that P.B. holds that factors one and two of the RRAS should not be scored for child pornography offenders. However, in P.B., the court only addressed factor two and held that it should not be scored for the "mere possession and viewing of child pornography." Id. at 181. As we have explained, however, this case does not involve the mere possession of child pornography because the evidence shows that N.F. "played a role in the penetrative activity either as a participant or a producer." Id. at 183.

Therefore, N.F.'s reliance upon P.B. is misplaced. Furthermore, in determining N.F.'s risk of re-offense it was entirely appropriate for the court to consider the numerous victims depicted in N.F.'s child pornography videos when scoring factors three, four, and five of the RRAS.

In view of our decision, that N.F. was correctly scored under the RRAS, we need not address the issue of whether other registrants, who have only been convicted of endangering the welfare of a child through the possession of child pornography, should be scored in factors one, three, four, and five.

V.

Next, N.F. argues that regardless of his score on the RRAS, he should only be subject to Tier I scope of community notification without placement on the Internet Registry, because his risk of re-offense is allegedly low, and he has made some progress in sex

offender treatment. N.F. argues that his case falls outside the "heartland" of Megan's Law cases and that the extent of notification ordered is excessive because of "unique" aspects of his case. Again, we disagree.

Generally, in challenging a registrant's RRAS score or the scope of community notification, "expert testimony will be neither necessary nor helpful." G.B. 147 N.J. at 85. However, "in limited circumstances, expert testimony may be introduced . . . to establish the existence of unique aspects of a registrant's offense or character that render the [RRAS] score suspect." Id. at 68. The court has "the ultimate authority to decide what weight to attach to the [RRAS] and what weight to attach to expert testimony." Id. at 85. "The final determination of dangerousness lies with the courts, not the expertise of psychiatrists and psychologists." Id. at 86 (quoting In re D.C., 146 N.J. 31, 59 (1996)).

Moreover, there is a presumptive scope of community notification concerning Tier II offenders. In re Registrant M.F., 169 N.J. 45, 62 (2001). "Unless limiting circumstances affecting the nature of a [Tier II] registrant's risk of re-offense are presented, the State is entitled to give effect to the legislative preference, indeed presumption, of the need for notice to the specified schools and community organizations located in the area

22

frequented by a registrant." <u>Ibid.</u> This presumption "logically advances the legislative goal of public protection, specifically the protection of children and women vulnerable to a sex offender with a moderate risk of re-offending." <u>Ibid.</u>

In this case, although N.F. apparently has made some progress in his sex offender treatment while at the Adult Diagnostic Treatment Center, N.F. has failed to present any unique aspects of his offense or his character that would render the RRAS score suspect or warrant departure from the community notification recommendations pursuant to the Guidelines adopted by the New Jersey Attorney General. N.F. relies in large part on the testimony and report of Dr. Reynolds, who opined that N.F. should be tiered as a "low risk" offender. The record shows, however, that Dr. Reynolds did not consider all of the available evidence when evaluating N.F. Dr. Reynolds did not have any progress reports of N.F.'s current treatment. In formulating his opinion, Dr. Reynolds did not include any conduct that did not result in a criminal conviction. He chose not to consider J.D.'s statements, claiming it was only an allegation "that was not proved."

We therefore conclude there is sufficient credible evidence to support the trial court's finding that N.F. should be classified in Tier II, and subject to Tier II community notification and placement in the Internet Registry.

23

VI.

N.F. also argues for the first time on appeal that factors three, four, and five of the RRAS are being scored differently by certain counties when scoring child pornography offenders. N.F. maintains that the lack of uniformity between the counties raises the possibility of arbitrary and county-specific scoring on the RRAS.

"[I]ssues not raised below will ordinarily not be considered on appeal unless they are jurisdictional in nature or substantially implicate the public interest." N.J. Div. of Youth and Family Servs. v. M.C. III, 201 N.J. 328, 339 (2010). Although N.F. contends at least one county does not score victim characteristics for persons convicted of child-pornography-related offenses, we do not have a sufficient record concerning that matter, or any record regarding how other counties score the RRAS for persons convicted of offenses involving child pornography. Therefore, we cannot address the issue.

We note again that this case does not involve child endangerment through the possession of child pornography. It involves a registrant convicted of endangering the welfare of a child through the distribution of child pornography. Moreover, this case involves a registrant who engaged in penetrative activity with a young female victim, as a participant and producer of a

A-1387-16T1

child pornography video. We hold that under these circumstances, it is not arbitrary or capricious for the court to consider the registrant's possession of numerous child pornography videos, with a multiplicity of victims depicted therein, when scoring factors three, four, and five of the RRAS.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1387-16T1