# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0559-23

IN THE MATTER OF
REGISTRANT J.S.

Submitted October 17, 2024 – Decided December 2, 2024

Before Judges Marczyk and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. PG-22020034.

J.S., appellant pro se.

Mark Musella, Bergen County Prosecutor, attorney for respondent State of New Jersey (Edward F. Ray, Assistant Prosecutor, on the brief).

PER CURIAM

Registrant J.S.[1] appeals from the trial court's August 1, 2023 order, which classified him as a Tier Three sex offender pursuant to the registration and community notification provisions of Megan's Law, N.J.S.A. 2C:7-1 to -23.  J.S.

---

[1] We use initials to preserve the confidentiality of these proceedings.  R. 1:38-3(c)(9).

principally challenges the Registrant Risk Assessment Scale (RRAS) scores imposed under factor 7, the length of time since the last offense. Finding no merit in J.S.'s arguments, we affirm.

I.

In February 2015, then fourteen-year-old S.M. gave a sworn statement to the Bergen County Prosecutor's Office (BCPO) stating that J.S. sexually assaulted her in July or early August 2013 when she was thirteen years old. On the day of the assault, J.S., who had recently finished high school, asked S.M. to meet him at a local bridge to hang out. S.M. noted J.S. acted "weird" and seemed angry when he arrived. S.M. stated J.S. told her he wanted to have sex. After S.M. advised J.S. she did not want to have sex and tried to leave, J.S. "pulled her by her wrist, pushed her to the ground, ripped off her pants," and engaged in forceful sex, "causing her pain." S.M. stated, at one point, J.S. "grabbed her by the throat, pushed her against a wall" and put his penis in her mouth. J.S. also slapped her in the face, pulled her hair, and cut her left arm with a piece of glass. S.M. later ran away from the scene.

S.M. informed investigators that prior to the sexual assault she went to J.S.'s house where he showed her child pornography on his laptop. She could see there were hundreds of files in a folder labeled "[g]irls." S.M. observed one

A-0559-23

of the files depicted "what appeared to her to be two naked [seven] year old girls" engaging in sexual acts with each other. J.S. told S.M. he "liked [girls] up to eleven" and "the youngest he would 'go is four.'"

The BCPO subsequently executed a search warrant on J.S.'s home and seized his computer. J.S. waived his Miranda[2] rights and admitted to engaging in oral sex and sexual intercourse with S.M. and that his computer contained images of child pornography. A forensic examination found thousands of images and video files depicting child sexual exploitation on J.S.'s computer.

J.S. was charged with the following: (i) second-degree sexual assault, N.J.S.A. 2C:14-2(c)(4); (ii) third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a); and (iii) third-degree possession of child pornography, N.J.S.A. 2C:24-4(b)(5).

During the investigation concerning the child pornography on J.S.'s computer, detectives identified one of the young girls depicted in the images as E.V. In March 2015, then fifteen-year-old E.V. stated when she was in seventh or eighth grade, J.S. asked her to send pictures of her breasts and vagina, and herself masturbating, which she did. J.S. also sent photos of his erect penis to E.V. Additionally, when E.V. was in eighth grade, she declined J.S.'s invitation

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-0559-23

to "hook up" and have sex with him. Based on the foregoing, J.S. was additionally charged with one count of first-degree endangering the welfare of a child, manufacturing of child pornography, N.J.S.A. 2C:24-4(b)(3), and two counts of third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a).

S.M. also advised the BCPO that J.S. had sexually assaulted another young girl, S.R. S.R. was subsequently interviewed and informed investigators that J.S. forced her to have sexual intercourse on a regular basis when she was fourteen or fifteen years old. She would tell J.S. that she did not want to have sexual intercourse, at which point J.S. became forceful and yelled at her. According to the investigation report, "[S.R.] stated that [J.S.] forced sexual intercourse [and performed various sexual acts] on her, . . . and at times, held her down, yelled and screamed at her." J.S. told S.R. that he "'liked' girls, aged [eight to twelve]." He stated "[h]e was interested in girls this age that had pubic hair, and more specifically, were defecating or urinating." He asked S.R. if she wanted to see those images, which she declined. J.S. was charged by juvenile complaint for sexually assaulting S.R., but the complaint was later dismissed because she did not want to proceed with the charges.

In June 2016, J.S. pled guilty to one count of second-degree sexual assault of S.M. and one count of third-degree endangering the welfare of E.V. In

September 2016, J.S. was examined by licensed psychologist and forensic health examiner, Mark Frank, Ph.D. Although J.S. claimed he did not recall sexually assaulting S.M. because of his heavy drug use, he did not dispute her version of the events and acknowledged, "I must have forced her." He conceded he asked E.V. to send him naked photos of her engaging in certain sexual acts. He also admitted being attracted to "girls as young as [twelve to thirteen years old]" and that he had images on his computer of children who were even younger. He said his attraction to young girls is "like a drug" and he "[could not] stop." Dr. Frank determined that J.S.'s conduct was characterized by a pattern of "repetitive, compulsive" behavior. This made J.S. "eligible for sentencing under the purview of the New Jersey Sex Offender Act."

On October 21, 2016, J.S. was sentenced to seven years in state prison on count one with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. He was further sentenced to five years on count two to run concurrently with count one. The court also ordered parole supervision for life (PSL), no contact with the victims, imposition of Megan's Law reporting requirements, and two Nicole's Law restraining orders. See N.J.S.A. 2C:14-2 and N.J.S.A. 2C:44-8. J.S. was paroled on August 27, 2022.

In May 2023, the State completed an RRAS to determine J.S.'s requirements for sex-offender registration and the level of notice to the community. Based on obtaining a score of eighty under the RRAS, the State sought a Tier Three classification, placing J.S. in high-risk range.[3] The State scored J.S. in the following categories: (1) factor 3, "age of victim," assessed as high risk because S.M. and E.V. were under thirteen years old when J.S. began his relationship with them; (2) factor 7, "length of time since last offense," assessed as high risk because, as of the July hearing, a year had not lapsed since J.S.'s parole date (August 27, 2022); and (3) factor 8, "history of anti-social acts," assessed as high risk due to J.S.'s "multiple school suspensions."

In July 2023, the trial court held a Megan's Law tier hearing. During the proceeding, J.S.'s prior counsel challenged the State's scoring of RRAS factors 3, 7 and 8. Regarding factor 3, counsel argued all three victims were thirteen years or older when the offenses occurred, which would have reduced J.S.'s score under that factor. According to counsel, J.S.'s total RRAS score would have decreased to seventy points, thereby changing his classification from Tier Three to Tier Two.

---

[3] An RRAS score between 74 and 111 is considered high risk.

6

In response, the State contended J.S. was properly scored. Notably, his relationship with E.V. and S.M. began when they were twelve years old, even though the sexual acts with S.M. happened after she turned thirteen. Furthermore, J.S. showed S.M. photos of child sexual abuse materials, and discovery referenced sexual images of victims "as young a[s] [seven] [years old]." Additionally, the State pointed to J.S.'s statements made in the Avenel report and to S.M. and S.R. regarding his attraction to girls ranging from eight to thirteen years old. Lastly, after calculating the date ranges of J.S.'s offenses and the birth dates of S.R. and E.V., the State argued they would have been twelve when the offenses occurred.[4]

The court held additional oral argument later in July 2023. J.S.'s prior counsel conceded the State was justified in scoring factor 3 as high risk because "it's not disputed that . . . the pornographic material . . . depicted children under age [thirteen]." J.S.'s counsel acknowledged the score of eighty was accurate.

J.S. argued that even if he scored an eighty (Tier Three), the court should exercise its discretion and classify him as Tier Two, moderate risk offender. J.S.

---

[4] S.M. was born in July 2000, and the conduct for count one occurred between July 1, 2013, and August 30, 2013. E.V. was born in June 1999, and the conduct for count two of endangering occurred between September 1, 2011, and August 30, 2013.

contended he completed a six-year sentence at Avenel where he had a good prognosis, with no evidence of sexual interest in children, impulsivity, and he understands sexual consent.

J.S. further asserted that his total score should be seventy-four because, at the time of the hearing, he was only a month away from being on parole for one year without an offense, thereby reducing his factor 7 score, length of time since last offense, from high risk to moderate. Notwithstanding that the reduced score under factor 7 resulted in an overall score of seventy-four—still in the Tier Three range—counsel urged the court to exercise its discretion and classify J.S. as Tier Two.

The State responded that J.S. should be classified as Tier Three due to the violence used against S.M. during the "sexual assault." The State noted J.S. indicated in the Avenel report that he denied parts of the assault and had a hard time understanding how his actions qualified as rape.

The trial court ruled that J.S.'s score of eighty was undisputed and fell within Tier Three classification. The court also noted that even if it accepted J.S.'s argument that he would be offense free for a year as of September 2023, it would only result in a reduction of the RRAS to seventy-four, which would still be in the Tier Three high-risk range. The court declined to exercise its

8

discretion, finding it not "appropriate" to depart from the RRAS score under the facts of this case. The court based its decision on "clear and convincing evidence" in the record, including the two victims suffering "particularly heinous" and violent sexual assaults, J.S.'s lack of remorse and not acknowledging the conduct as a sexual assault, and the age of the victims. The court imposed a notification of J.S.'s sex-offender status within one mile of J.S.'s home, door-to-door notification within two-tenths of a mile from J.S.'s home, and internet registration.

On August 1, 2023, the court issued an order reflecting the Tier Three designation and notification requirements. Thereafter, J.S. appealed.

II.

J.S. raises the following points on appeal:

POINT I

THE FAILURE TO GIVE J.S. CREDIT ON RRAS ITEM []7 FOR TIME LIVING OFFENSE-FREE IN THE COMMUNITY FOR THE PERIOD HE WAS RELEASED ON BAIL CONSTITUTED REVERS[IBLE] ERROR.

A. The RRAS Scoring Manual for Item []7 Counts Any Time a Registrant Remains at Risk in the Community without Reoffending.

9

B.    J.S. Remained at Risk in the Community without Reoffending for Over Two Years.

POINT II

DEFENSE COUNSEL WAS INEFFECTIVE AT J.S.'S MEGAN'S LAW TIER HEARING FOR FAILING TO CHALLENGE THE STATE'S SCORING OF RRAS ITEMS []3 AND []8.

A.    Registrants Challenging the State's Recommended Tier Classification and Scope of Notification at a Megan's Law Tier Hearing Are Constitutionally Entitled to Effective Assistance of Counsel.

B.    Sex Offense Risk Assessment Is a Specialized Scientific Field of Inquiry and Attorneys Representing Registrants in Contested Megan's Law Tier Hearing Must Consult with Forensic Experts in Order to Effectively Represent Their Client.

C.    Counsel Failed to Consult with a Forensic Expert in Sex Offense Risk Assessment to Determine Whether the Scoring and Use of the RRAS Was Reliable and Valid.

D.    J.S.'s Counsel Was Ineffective for Failing to Challenge the State's Scoring of RRAS Items []3 and []8 under the Newly Adopted Daubert Standard for Determining the Admissibility of Scientific, Technical and Other Specialized Knowledge.

10

E.     Properly Scored, the RRAS Yields a Result that Places J.S. Squarely in the Tier [Two] Classification of Megan's Law.

F.     Even if the Appellate Division Declines to Grant J.S. Relief Regarding RRAS Items []3 and []8, a Remand for a New Megan's Law Hearing Is Required Because the Megan's Law Court's Rejection of Counsels Request for Discretionary Reduction to Tier [Two] Was Premised on a Higher RRAS Score.

"We review a trial court's conclusions regarding a Megan's Law registrant's tier designation and scope of community notification for an abuse of discretion." In re Registrant B.B., 472 N.J. Super. 612, 619 (App. Div. 2022). "[A]n abuse of discretion 'arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" State v. R.Y., 242 N.J. 48, 65 (2020) (internal quotations omitted) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)). However, "[a] trial court's interpretation of the law and the . . . consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

"In challenging a tier determination, a registrant may argue that (1) the RRAS score was erroneously calculated, (2) the case falls outside the 'heartland' of Megan's Law cases, or (3) the extent of community notification required is

excessive due to 'unique' aspects of the registrant's case." <u>In re Registrant J.G.</u>, 463 N.J. Super. 263, 275 (App. Div. 2020) (citing <u>In re T.T.</u>, 188 N.J. 321, 330 (2006)).

The purpose of Megan's Law is "to protect the community from the dangers of recidivism by sexual offenders." <u>In re C.A.</u>, 146 N.J. 71, 80 (1996) (citing N.J.S.A. 2C:7-1(a)). "The law is remedial and not intended to be punitive." <u>In re A.A.</u>, 461 N.J. Super. 385, 394 (App. Div. 2019) (citing <u>Doe v. Poritz</u>, 142 N.J. 1, 14 (1995)). "The expressed purposes of the registration and notification procedures [under Megan's Law] are 'public safety' and 'preventing and promptly resolving incidents involving sexual abuse and missing persons.'" <u>Ibid.</u> (quoting N.J.S.A. 2C:7-1).

The Megan's Law "[t]ier designations reflect a registrant's risk of re-offense, as determined by a judge assessing various information, including thirteen factors referenced in the RRAS." <u>In re Registrant C.J.</u>, 474 N.J. Super. 97, 106 (App. Div. 2022), <u>cert. denied</u>, 253 N.J. 602 (2023). Pursuant to N.J.S.A. 2C:7-2(a), the RRAS was developed for the State's use "to establish its prima facie case concerning a registrant's tier classification and manner of notification." <u>T.T.</u>, 188 N.J. at 328 (quoting <u>C.A.</u>, 146 N.J. at 110). The RRAS "is presumptively accurate and is to be afforded substantial weight—indeed it

12

will even have binding effect—unless and until a registrant 'presents subjective criteria that would support a court not relying on the tier classification recommended by the Scale.'" In re G.B., 147 N.J. 62, 81 (1996) (quoting C.A., 146 N.J. at 109). "Although a tier classification made on the basis of the Scale should be afforded deference, a court should not rely solely on a registrant's point total when it conducts a judicial review of a prosecutor's tier level classification or manner of notification decisions." C.A., 146 N.J. at 108. "Judicial determinations regarding tier classification and community notification are made 'on a case-by-case basis within the discretion of the court[]' and 'based on all of the evidence available[,]' not simply by following the 'numerical calculation provided by the [RRAS].'" C.J., 474 N.J. Super. at 120 (alterations in original) (citing G.B., 147 N.J. at 78-79).

The RRAS contains four categories of review: seriousness of the offense; offense history; personal characteristics; and community support. See State v. C.W., 449 N.J. Super. 231, 260 (App. Div. 2017) (citing In re Registrant V.L., 441 N.J. Super. 425, 429 (App. Div. 2015)). "The first two categories, '[s]eriousness of [o]ffense' and '[o]ffense [h]istory,' are considered static categories because they relate to the registrant's prior criminal conduct." C.A., 146 N.J. at 103. The next two categories, "[c]haracteristics of '[o]ffender' and

'[c]ommunity [s]upport' are considered to be dynamic categories, because they are evidenced by current conditions." Ibid. The "static factors" relate to past criminal conduct and weigh more heavily under the RRAS than the dynamic factors. In re Registrant J.M., 167 N.J. 490, 500 (2001).

The "[s]eriousness of [o]ffense" category takes into account: (1) degree of force; (2) degree of contact; and (3) age of the victim(s). C.A., 146 N.J. at 103. The "[o]ffense [h]istory" category covers: (4) victim selection; (5) number of offenses/victims; (6) duration of offensive behavior; (7) length of time since last offense; and (8) any history of anti-social acts. Ibid. The "[c]haracteristics of [o]ffender" category accounts for the registrant's: (9) response to treatment and (10) substance abuse. Id. at 103-04. The final category, "[c]ommunity [s]upport" considers a registrant's: (11) therapeutic support; (12) residential support; and (13) employment/educational stability. Id. at 104.

"Each factor is assigned a risk level of low (0), moderate (1), or high (3), and '[t]he total for all levels within a category provides a score that is then weighted based on the particular category.'" A.A., 461 N.J. Super. at 402 (alteration in original) (quoting C.A., 146 N.J. at 104). "An RRAS score [totaling] 0 to 36 is low risk; 37 to 73 moderate risk; and 74 or more, high risk." T.T., 188 N.J. at 329. The State ultimately bears the burden of proving—by

14

clear and convincing evidence—a registrant's risk to the community and the scope of notification necessary to protect the community. In re Registrant R.F., 317 N.J. Super. 379, 383-84 (App. Div. 1998).

A.

J.S. contends the court failed to give him credit on RRAS factor 7 because it should be measured from the "last offense" when he was "in a situation in which he . . . [had] ready, unsupervised access to potential victims." He asserts that his last offense was on February 24, 2015, when the BCPO seized his computer. He argues that although he was detained from February 24, 2015 until March 4, 2015, he was "released into the community" until March 19, 2015, when he was again arrested. However, he was released again on April 13, 2015, until he was sentenced on October 21, 2016. Therefore, he was "at risk" in the community for 572 days without committing another offense. He was then released from custody on August 27, 2022, and was in the community another 339 days prior to the Megan's Law hearing. He maintains he was offense free for two years, five months and twenty-eight days at the time of the hearing. Accordingly, he argues the court miscalculated the length of time since his last offense, and he should have been scored as a moderate risk under factor 7, which would in turn reduce his RRAS score from eighty to seventy-four.

15

The State counters J.S. waived this argument because he failed to raise the issue of his offense-free time period prior to his sentencing. It further notes that the belated argument is not suited for our consideration because the trial court never determined whether J.S., in fact, remained offense free and that issue could only be resolved by a hearing. Alternatively, the State asserts that an RRAS score of seventy-four still places J.S. in Tier Three, and the trial court properly determined it would not be appropriate to depart from the risk assessment under the facts of this case.

We need not consider arguments not raised before the trial court. Selective Ins. Co. of Am. v. Rothman, 208 N.J. 580, 586 (2012); Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973); see also State v. Robinson, 200 N.J. 1, 19 (2009) ("Appellate review is not limitless. The jurisdiction of appellate courts rightly is bounded by the proofs and objections critically explored on the record before the trial court by the parties themselves."); Zaman v. Felton, 219 N.J. 199, 226-27 (2014); R. 2:2-3.

During the Megan's Law tier hearing, J.S. did not raise the issue that his pre-sentencing period should be included in scoring the length of time he remained offense free under factor 7 of the RRAS. J.S.'s only challenge to factor 7 was that "as of . . . August 27[] [he] will be one year on parole, . . . [and] would

16

then be [seventy-four] points as opposed to [eighty]." Notably, J.S. conceded an RRAS score of seventy-four points would still place him in the Tier Three classification, but he asked the court to exercise its discretion and designate him as Tier Two. Although the pre-sentence time issue was not properly raised below, because factor 7 was generally addressed, we briefly address the issue.

Even if the trial court included the pre-sentence period, thereby reducing the score of factor 7 to the moderate risk range, J.S.'s total RRAS score would, nevertheless, have been seventy-four, which still places him in Tier Three. The trial court recognized this and noted that even if it accepted J.S.'s argument, his score still placed him in the "high range." Importantly, the trial court then found it would be inappropriate under the circumstances to depart from the RRAS, and it refused to exercise its discretion to reduce J.S.'s designation to Tier Two. In reaching this decision, the court thoroughly reviewed the record, including the two children suffering "heinous" and "violen[t]" sexual assaults, and J.S. not "show[ing] remorse for the conduct" or "acknowledg[ing] the conduct as rape or . . . sexual assault." In short, the court concluded J.S.'s conduct falls "squarely in the high-risk range . . . for all of the circumstances set forth [in] the record."

We conclude the court did not misapply its discretion in denying J.S.'s request to reduce his tier designation. Even assuming the trial court accounted

17

for the pre-sentencing time period and reduced the score of factor 7, J.S. would still have been designated a Tier Three offender, and there is no reason to suggest the trial court would have departed from the Tier Three classification which it determined was supported by substantial credible evidence.

We are satisfied the trial judge's assessment of the RRAS was not an abuse of discretion. The trial judge appropriately assessed J.S.'s RRAS factors after a thorough review of the evidence and arguments presented and appropriately considered the age of the victims, the level of violence, and what J.S. has done to better himself since being released into the community. Based on the totality of the circumstances, the court determined that it was not appropriate to classify J.S. as a Tier Two offender. The court's conclusion was well supported by the record, and we discern no basis to disturb the Tier Three classification.

## B.

J.S. next advances a series of arguments asserting that his defense counsel was ineffective at the Megan's Law hearing. Specifically, he argues counsel was ineffective by failing to: obtain a psychosocial evaluation or risk assessment of J.S.; consult with an expert to challenge whether the RRAS is a reliable tool; and investigate whether the State properly scored the RRAS.

A-0559-23

The State counters that J.S.'s direct appeal "is not the appropriate vehicle by which to bring his ineffective assistance of counsel claims because they were never raised" or properly considered by the trial court. It further contends that these arguments are "more appropriately raised in a motion to the trial court for a reevaluation of the RRAS factors based on changed circumstances[,] . . . not through ineffective assistance of counsel claims on direct appeal." It notes the Attorney General Guidelines provide that tier determinations are an "ongoing process" and "evidence of change of circumstances or in the relevant factors may trigger a reevaluation." Attorney General Guidelines for Law Enforcement for the Implementation of Sex Offender Registration and Community Notification Laws 53 (rev. 2007).

J.S., in turn, relies on New Jersey Division of Youth & Family Services v. B.R., 192 N.J. 301 (2007), for the proposition that an ineffective assistance of counsel claim should be permitted in the context of a Megan's Law appeal. J.S. argues the B.R. Court determined direct appeal provided a practical means of affording a post-hearing remedy for ineffective assistance of counsel.

B.R. involved a termination of parental rights case. The Court found direct appeal to be an appropriate "vehicle for determining an ineffectiveness claim" because it would be the least time-consuming alternative for correcting

erroneous terminations, which is significant given the "need to stabilize the circumstances of the child." Id. at 310. Such cases are time sensitive in nature and must be expedited due to the possibility of emotional damage to the child and detrimental effect on the families. Ibid.

J.S.'s reliance on B.R. is misplaced. He provides no meaningful argument as to why a Megan's Law proceeding is analogous to termination of parental rights for the purposes of allowing an ineffective assistance of counsel claim to proceed on direct appeal. B.R. is readily distinguishable because the Court was concerned with a child being left in "limbo" in the foster care system when there is "uncertainty about whether a termination order will withstand appeal." Ibid. (quoting Susan Calkins, Ineffective Assistance of Counsel in Parental-Rights Termination Cases: The Challenge for Appellate Courts, 6 J. App. Prac. & Process 179, 207 (2004)). The same concerns are not present in a Megan's Law appeal.

"Generally, a claim of ineffective assistance of counsel cannot be raised on direct appeal." State v. Sparano, 249 N.J. Super. 411, 419 (App. Div. 1991). Instead, a "defendant must develop a record at a hearing at which counsel can explain the reasons for his conduct and inaction and at which the trial judge can rule upon the claims including the issue of prejudice." Ibid. Our Supreme Court

has expressed a "general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record." State v. Preciose, 129 N.J. 451, 460 (1992). Only in the rare instances "when the trial itself provides an adequately developed record upon which to evaluate defendant's claims," should an appellate court consider the issue of ineffective assistance of counsel on direct appeal. State v. Castagna, 187 N.J. 293, 313 (2006).

We conclude that resolving J.S.'s ineffective assistance of counsel claims involves an analysis of strategic decisions and other evidence that lies outside the record, and a proper record was not developed before the trial court. We therefore decline to consider J.S.'s ineffective assistance of counsel claims.

To the extent we have not addressed any of J.S.'s remaining arguments, it is because we have concluded they are of insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

21